IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IKIEM SMITH,                                    *

     Plaintiff,                             *

v.                                              *          Civil Action No. GLR-18-2836

SEAN HARRIS, et al.,                            *

     Defendants.                            *

***

**<u>MEMORANDUM OPINION</u>**

THIS MATTER is before the Court on Defendants Corporal Michael Cox, Sergeant Sean Harris, Former Trooper First Class ("TFC") Justin Hohner, TFC Ryan Boyce, and TFC James Pettit's (collectively, "Police Defendants") Motion to Compel, or in the Alternative, Motion to Dismiss. (ECF No. 78). The Motion is ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2021). For the reasons set forth below, the Court will grant in part and deny in part Police Defendants' Motion.

## I.    BACKGROUND

On February 16, 2017, Defendants Michael Cox and Sean Harris of the Maryland State Police ("MSP") initiated a traffic stop of Plaintiff Ikiem Smith in Cecil County, Maryland. Smith fled the scene, leading to a high-speed chase down I-95. A few minutes and several miles later, Smith pulled onto the shoulder and several officers attempted to apprehend him. Smith contends that Defendant Ryan Boyce then directed his police dog to bite Smith, causing significant injuries. Smith brings this action under 42 U.S.C. § 1983,

alleging that Police Defendants used excessive force when they directed the dog to bite him or otherwise failed to intervene in the improper use of force.

The parties' current dispute centers around Smith's invocation of his Fifth Amendment right against self-incrimination during his deposition. As the issue requires an understanding of Smith's potential federal and state criminal liability, the Court will review his criminal history, the subject use of force and arrest, his subsequent criminal proceedings, and the procedural history in this Court.

**A.      Smith's Criminal History**

Dating back to the 1990s, Smith has been charged with several "street-level narcotics-related and other offenses" in both Pennsylvania, where he lived at the time of the subject incident, and Maryland. (Pl.'s Mem. Law Opp'n Defs.' Mot. Compel Alternative Mot. Dismiss ["Opp'n"] at 3, ECF No. 82 (citing Maryland v. Smith, Nos. C-07-K-16-336, C-07-K-16-64, C-07-CR-17-945, C-07-CR-17-230 (Cir.Ct.Md.))). In 2016, before the incident giving rise to this civil suit, Smith was a suspect in an MSP investigation regarding a stolen handgun that had been taken from a car in the North East Shopping Plaza located in Cecil County, Maryland. (Opp'n at 3 (citing Steven Jeurgens Dep. at 13:18–14:6, 16:2–10)).[1] According to Smith, his vehicle matched a description of the suspect's vehicle in that offense. (Id.).

On January 7, 2016, officers spotted Smith's vehicle while investigating at a nearby residence. (Id. at 3–4). Smith was arrested that day on unrelated drug charges (the "2016

_____

[1] Although Smith did not provide the deposition transcript to the Court, the Court includes the citation here for completeness.

Arrest"). (Id. at 4 (citing <u>Smith</u>, Case No. 07-K-16-64)). When officers brought Smith in after the 2016 Arrest, they tried to interview him about the handgun. (Id. (citing Steven Jeurgens Dep. at 17:17–20)). It is not apparent from the filings whether Smith participated in the interview; Smith was not charged with the theft, however, and the gun was reportedly recovered. (<u>See</u> id.). On February 2, 2017, Smith failed to appear at a court hearing related to his 2016 Arrest and the circuit court issued a warrant. (Id.).

**B.**     <u>**Smith's 2017 Arrest and Excessive Force Allegations**</u>

On February 16, 2017, at around 10:15 p.m., Smith was driving South on Route 272 in Cecil County, Maryland. (Am. Compl. ¶¶ 12, 13, ECF No. 63). Defendants Cox and Harris were on duty and initiated a traffic stop of Smith. (Id. ¶ 14). Smith contends that he asked Cox and Harris why they pulled him over and when they allegedly did not respond, he decided to flee the scene under the "belief that [Cox and Harris] did not have adequate cause to pull him over." (Id.). Cox and Harris pursued Smith southbound on Route 272. (Id. ¶ 15). At least seven police vehicles joined the chase, including vehicles containing Defendants Cox, Harris, Pettit, Hohner, and at least ten other officers.[2] (Id.). At some point, Smith drove onto northbound I-95. (Id. ¶ 16).

"Less than five minutes after the pursuit began," Smith stopped his car on the shoulder of I-95. (Id.). Cox, Harris, Pettit, Hohner, and at least six other officers ran toward Smith's car with their weapons drawn, instructing Smith to "[k]eep [his] hands up." (Id. ¶ 19). Smith alleges he placed both his hands on the driver's side window to demonstrate

---

[2] Smith does not specifically allege that Defendant Boyce was involved in the initial pursuit. (<u>See</u> Am. Compl. ¶ 15).

that he was not a threat. (Id. ¶ 20). An officer broke Smith's window with a nightstick, causing Smith to sustain several lacerations on one of his hands from the broken glass. (Id. ¶ 21). Pettit and Hohner then pulled Smith out through the window. (Id. ¶ 22). Smith alleges that they threw him to the ground facedown "while holding onto his arms." (Id. ¶ 23). Smith used his hands to break his fall. (Id.).

Pettit and Hohner allegedly pinned Smith's head to the ground and pulled his hands behind his back. (Id. ¶ 25). Smith could hear Cox and Harris yelling, "Why the f*** did you run?" (Id. ¶ 26). Pettit and Hohner placed Smith in handcuffs. (Id. ¶ 27).

According to Smith, Boyce removed his police dog, a German Shepherd, from his vehicle. (Id. ¶ 30). Smith could hear the dog barking while Pettit and Hohner handcuffed him. (Id. ¶¶ 27, 32). Pettit and Hohner kept him pinned while Cox and Harris patted him down. (Id. ¶¶ 33, 34). When Cox and Harris reached Smith's legs, one of the officers raised Smith's right leg and removed his right shoe and sock. (Id. ¶ 34). Boyce allegedly directed his K-9 to bite Smith's bare foot. (Id. ¶ 36). The dog bit down, briefly released, and then bit a second time, causing Smith to scream in pain. (Id. ¶ 37). The dog continued to grip Smith's foot until Boyce physically pulled him away. (Id. ¶ 38). The second bite was deep enough to expose "tendon, ligament, fatty tissue, and bone" in Smith's foot. (Id. ¶¶ 40, 52).

Smith alleges that as a result of the Police Defendants' use of excessive force, he sustained severe injuries, emotional distress, and mental anguish. (Id. ¶ 58). He further contends that due to his injuries, he may not be able to perform the duties necessary to return to his prior lawful employment in the sanitation field and in factory work. (Id. ¶ 59).

**C.**   <u>**Smith's Subsequent Criminal Proceedings**</u>

In July 2017, Smith was convicted of the drug charges tied to the 2016 Arrest. (Opp'n at 6 (citing <u>Smith</u>, No. C-07-K-16-64). Smith was also charged and convicted of various state criminal offenses related to the subject incident on February 16, 2017, including possession with intent to distribute a controlled substance. (<u>Id.</u> (citing <u>Smith</u>, No. C-07-CR-17-945). He was further charged and convicted of first-degree assault, resisting arrest, and other "driving-related offenses." (<u>Id.</u> (citing <u>Smith</u>, No. C-07-CR-17-230). Smith has filed for post-conviction relief in all three cases. (<u>Id.</u> at 6, 7).

**D.**   <u>**Smith's Deposition in the Subject Litigation**</u>

On April 6, 2021, the Court referred this case to United States Magistrate Judge J. Mark Coulson for all discovery matters. (ECF No. 58). On May 12, 2021, the parties jointly wrote Judge Coulson about a dispute over the scope of Smith's deposition scheduled for early June 2021. (May 12, 2021 Letter at 1, ECF No. 69). On May 13, 2021, Smith moved for a protective order, as he was concerned that Police Defendants might ask him potentially incriminating questions. (May 13, 2021 Letter from Smith at 1, ECF No. 70). Smith argued that questions regarding prior bad acts were irrelevant to the facts in his excessive force case and requested that the Court enter a protective order to protect him "from a fishing expedition into irrelevant and potentially incriminating topics." (<u>Id.</u>). Police Defendants responded that a preemptive protective order was unnecessary and that Smith "should be required to invoke his Fifth Amendment privilege on a question-by-question basis" at his deposition. (May 13, 2021 Letter from Police Defs. at 1, ECF No. 71).

On May 21, 2021, Judge Coulson issued an Order denying Smith's Motion. (May 21, 2021 Order at 1, ECF No. 72). Judge Coulson explained that the Court could not "engage in a[n] . . . analysis [of the Fifth Amendment issues] at [a] pre-deposition juncture." (Id.). He suggested that at the coming deposition, counsel for Smith should "carefully consider each question posed . . . and make a good faith recommendation" regarding whether Smith should invoke his Fifth Amendment right against self-incrimination. (Id. at 4).

Police Defendants deposed Smith on June 2, 2021. (Videotape Dep. Ikiem Smith ["Smith Dep."] at 1, ECF No. 82-2). During the four-and-a-half-hour deposition, counsel for Smith permitted him to answer 730 questions but instructed him not to answer twenty-nine questions because they were "potentially incriminating." (Opp'n at 1, 9–10). Counsel for Smith has helpfully broken the unanswered questions out into six categories, which the Court amends as follows:

**Category One: Smith's Prior Criminal Conduct**
- "Do you recall the underlying facts of [the 1997 criminal] case?" (Smith Dep. at 185:13–14).
- [Asking about a prior drug conviction] "When you say 'manufacturing,' what do you mean by that? What are you referencing?" (Id. at 187:2–3).

**Category Two: Smith's Prior, Potentially Illegal Sources of Income**
- "I guess from October 2016 up until the date of the incident how were you supporting yourself?" (Id. at 170:19–21).

**Category Three: Smith's Prior Presence in the Area**
- "Prior to February 16, 2017, had you ever driven on the roadway where you were pulled over by the police on that date? (Id. at 45:3–5).
- "Prior to February 16, 2017, were you familiar with a town [called] North East located in Cecil County, Maryland?" (Id. at 45:14–16).

- "Prior to February 16, 2017, were you familiar with Cecil County, Maryland, in general?" (<u>Id.</u> at 46:4–5).
- "Prior to February 16, 2017, had you ever ben to the location known as the North East Shopping Plaza?" (<u>Id.</u> at 46:21–47:1).
- "Prior to February 16, 2017, had you ever been to that shopping plaza before?" (<u>Id.</u> at 58:21–22).

**Category Four: Prior Travel**
- "On the morning of February 16, 2017, do you recall where you were on that day?" (<u>Id.</u> at 37:13–14).
- "Do you recall where you were on the afternoon of February 16, 2017?" (<u>Id.</u> at 38:9–10).
- "[D]o you recall where you were on the early evening hours of February 16, 2017?" (<u>Id.</u> at 38:22–39:1).
- "And on February 16, 2017, did there come a time when you began operating that vehicle?" (<u>Id.</u> at 40:18–19).
- "Do you recall when you began to operate the Monte Carlo that day?" (<u>Id.</u> at 41:14–15).
- "Where were you coming from prior to being pulled over by a police vehicle?" (<u>Id.</u> at 43:10–11).
- "Where were you traveling to at the time you were pulled over by a police vehicle?" (<u>Id.</u> at 43:22–44:1).

**Category Five: The Initial Traffic Stop**
- "At some point you were operating the vehicle; correct?" (<u>Id.</u> at 42:8–9).
- "Do you recall the location where you were pulled over by a police vehicle?" (<u>Id.</u> at 44:12–13).
- "[A]t some point while traveling in your automobile on Route 272 in North East, Maryland, you realized there was a police car behind you; is that correct?" (<u>Id.</u> at 48:11–14).
- "At some point on February 16, 2017, you were traveling on Route 272 in North East, Maryland; is that correct?" (<u>Id.</u> at 49:13–15).
- "[D]id there come a time when you stopped your vehicle on Route 272 in North East, Maryland?" (<u>Id.</u> at 50:2–4).
- "Where did you stop your vehicle on Route 272, North East, Maryland?" (<u>Id.</u> at 50:16–17).
- "Did there come a time when an officer approached your vehicle on Route 272, North East, Maryland? (<u>Id.</u> at 51:5–7).
- "Upon approaching your vehicle, what, if anything, did the officer say to you?" (<u>Id.</u> at 51:18–19).
- "Did you know it was a law enforcement officer that approached your vehicle on Route 272 in North East, Maryland?" (<u>Id.</u> at 52:9–11).

- "Sitting here today, do you know the identity of the officer that approached your vehicle on Route 272 in North East, Maryland?" (Id. at 52:22–53:2).
- "Did there come a time when you left the scene of the traffic stop on North East, Maryland, Route 272?" (Id. at 53:10–12).
- "[A]t the scene of the first traffic stop on Route 272 in North East, Maryland, are you able to identify the officer that approached your vehicle as Michael Cox with the Maryland State Police?" (Id. at 54:21–55:3).
- "[O]n Route 272 in North East, Maryland, did any officer try to keep you from driv[ing] away from the scene of the first traffic stop?" (Id. at 56:20–57:1).

### Category Six: Events after the Initial Traffic Stop
- "When you saw Officer Cox I guess the first time after the incident . . . at [Howard R. Young Correctional Institution], do you recall any conversations you had with . . . Officer Cox at that time?" (Id. at 132:10–13).

## E.   Procedural Background

On September 12, 2018, Smith filed a Complaint in this Court against the Maryland State Police Department, the K-9, and the Police Defendants. (ECF No. 1). On February 1, 2019, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 11). Smith opposed the Motion, (ECF No. 13), and Defendants filed a Reply, (ECF No. 17). On March 15, 2019, Smith filed a Motion for Discovery (ECF No. 16). On April 23, 2019, Smith filed a Surreply to the Motion to Dismiss (ECF No. 18). On August 14, 2019, Police Defendants filed a Motion for Leave to File Supplemental Argument (ECF No. 20).

On August 15, 2019, the Court denied Smith's Motion for Discovery without prejudice and granted Defendants' Motion for Leave to File Supplemental Argument. (ECF No. 21). On August 26, 2019, Smith filed an Opposition to Police Defendants' Motion for Leave (ECF No. 22).

On September 30, 2019, the Court issued a Memorandum Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss. (ECF Nos. 23, 24). The Court dismissed Smith's claims against the Maryland State Police and the K-9, as well as any claims against Police Defendants in the official capacities. (Id.). The Court otherwise denied the Motion. (Id.).

On October 15, 2019, Police Defendants filed an Answer (ECF No. 25). On October 24, 2019, Smith filed a Motion for Appointment of Counsel (ECF No. 26) and a Motion for Discovery (ECF No. 27), which were unopposed. On January 6, 2020, Smith filed another unopposed Motion for Discovery and Motion Appointment of Counsel (ECF Nos. 28, 29). On April 27, 2020, the Court granted Smith's Motions for Appointment of Counsel and denied his Motions for Discovery without prejudice. (ECF No. 31). The Court appointed pro bono counsel on July 20, 2020. (ECF No. 33).

On March 5, 2021, Smith filed an unopposed Motion for Leave to File Amended Complaint (ECF No. 51). On April 2, 2021, Smith filed a letter detailing concerns about purported deficiencies in Defendants' discovery responses. (ECF No. 56). The Court referred the matter to United States Magistrate Judge J. Mark Coulson to resolve all discovery issues. (ECF Nos. 57, 58). On April 21, 2021, the Court granted Smith's Motion for Leave to File an Amended Complaint. (ECF No. 62). The Clerk docketed the Amended Complaint that day. (ECF No. 63).

The seven-count Amended Complaint alleges: violation of the Fourth Amendment – excessive force (Count I); violation of the Fourth Amendment – failure to intervene (Count II); violation of Article 24 of the Maryland Declaration of Rights – excessive force

(Count III); violation of Article 26 of the Maryland Declaration of Rights – excessive force (Count IV); battery (Count V); gross negligence (Count VI); and intentional infliction of emotional distress (Count VII). (Id. ¶¶ 60–109). Smith seeks economic and non-economic damages, including mental anguish, physical pain and suffering, emotional pain and suffering, medical costs, loss of enjoyment of life, court costs, attorney's fees, and punitive damages. (See, e.g., id. ¶¶ 65, 66).

On June 2, 2021, Police Defendants deposed Smith. (See Smith Dep.). On July 6, 2021, Police Defendants filed a Motion to Compel or, in the Alternative, Motion to Dismiss (ECF No. 78). Smith opposed the Motion on July 20, 2021 (ECF No. 82), and Police Defendants filed a Reply on August 3, 2021 (ECF No. 83).

## II.    DISCUSSION

### A.    **Standard of Review**

Under Federal Rule of Civil Procedure 37(a)(1), "a party may move for an order compelling disclosure or discovery." The motion "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Id. Rule 37 allows for a motion to compel deposition testimony. See Fed.R.Civ.P. 37(a)(3)(B)(i).

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed.R.Civ.P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." Id. Still, "all permissible discovery must be measured against the yardstick of proportionality." Lynn v. Monarch Recovery Mgmt., Inc., 285 F.R.D. 350,

355 (D.Md. 2012) (quoting <u>Victor Stanley, Inc. v. Creative Pipe, Inc.</u>, 269 F.R.D. 497, 523

(D.Md. 2010)).

**B.** **Analysis**

Police Defendants argue that the Court should compel Smith to answer the

remaining twenty-nine questions over his invocation of his right against self-incrimination.

(Defs.' Mem. Law Supp. Mot. Compel, Alternative, Mot. Dismiss ["Mot."] at 6, ECF No.

78-1).[3] The Fifth Amendment provides that "[n]o person shall be compelled in any criminal

case to be a witness against himself." U.S. Const., amend. V. The privilege extends to civil

cases. <u>Moser v. Heffington</u>, 214 A.3d 546, 554 (Md. 2019); <u>see</u> <u>McCarthy v. Arndstein</u>,

266 U.S. 34, 40 (1924). Indeed, the privilege applies "where the answer to interrogation

<u>might tend to subject the witness to criminal prosecution</u>." <u>Moser</u>, 214 A.3d at 557 (quoting

<u>Robinson v. Robinson</u>, 615 A.2d 1190, 1194 (Md. 1992)). The privilege may be invoked

during discovery and at trial. <u>Id.</u>; <u>see also</u> <u>N. River Ins. Co. v. Stefanou</u>, 831 F.2d 484, 486–

87 (4th Cir. 1987)).

The United States Supreme Court has cautioned that courts may not impose "a

sanction on a litigant that would make an assertion of his Fifth Amendment privilege

'costly.'" <u>Swann v. City of Richmond</u>, 462 F.Supp.2d 709, 712 (E.D.Va. 2006) (quoting

<u>Griffin v. California</u>, 380 U.S. 609, 614 (1965)); <u>see also</u> <u>Moser</u>, 214 A.3d at 554–55. The

Supreme Court has further suggested that courts cannot compel an individual in a civil case

---

[3] Police Defendants' Memorandum is not numbered. (<u>See</u> Mot.). Accordingly, citations to page numbers refer to the pagination assigned by the Court's Case Management and Electronic Case Files ("CM/ECF") system.

"to answer deposition questions . . . over a valid assertion of his Fifth Amendment right, absent a duly authorized assurance of immunity at the time." <u>Swann</u>, 462 F.Supp.2d at 712 (quoting <u>Pillsbury Co. v. Conboy</u>, 459 U.S. 248, 256–57 (1983)). The Court has noted that a deponent's "primary interest is that the protection be certain." <u>Pillsbury</u>, 459 U.S. at 257. "A valid assertion of the privilege requires only the existence of a plausible possibility that the person might be prosecuted in this country." <u>United States ex rel. DRC, Inc. v. Custer Battles, LLC</u>, 415 F.Supp.2d 628, 633 (E.D.Va. 2006) (citing <u>United States v. Sharp</u>, 920 F.2d 1167, 1170 (4th Cir. 1990)). Accordingly, the privilege does not apply where "feared prosecution is barred by the statute of limitations, double jeopardy, immunity or limited to a foreign jurisdiction." <u>Custer Battles</u>, 415 F.Supp.2d at 633; <u>see</u> <u>Sharp</u>, 920 F.2d at 1171.

Although the Fourth Circuit has yet to address it, courts in this circuit have found that there are "limited exceptions" to this general principle—particularly where the "assertion of the Fifth Amendment privilege would thwart 'discovery of issues at the hearts of plaintiff's lawsuit.'" <u>Swann</u>, 462 F.Supp.2d at 712 (quoting <u>Wehling v. Columbia Broadcasting Sys.</u>, 608 F.2d 1084, 1086 (5th Cir. 1979)); <u>Graham v. Cox</u>, No. JMC-18-221, 2021 WL 2207403, at *4 (D.Md. June 1, 2021) (noting that a plaintiff may not "invoke his right . . . as a sword 'to gain an unequal advantage against the party he has chosen to sue.'" (quoting <u>Wehling</u>, 608 F.2d at 1087)). Further, this Court has held that "it is proper to dismiss the claim of a plaintiff who exercises his privilege against self-incrimination to refuse to answer questions related to the issues involved in the litigation which he has instituted." <u>Mount Vernon Sav. & Loan v. Partridge Assocs.</u>, 679 F.Supp. 522, 529 (D.Md. 1987). This Court and the District Court for the Eastern District of Virginia have adopted

a "balancing approach" applied in other circuits in cases where a party in a civil suit asserts his Fifth Amendment privilege and refuses to respond to deposition questions. <u>Swann</u>, 462 F.Supp.2d at 713; <u>Graham</u>, 2021 WL 2207403, at *4; <u>see also</u> <u>Serafino v. Hasbro, Inc.</u>, 82 F.3d 515, 518 (1st Cir. 1996); <u>Wehling</u>, 608 F.2d at 1088. The Court will apply the same approach and weigh the following factors in considering Police Defendants' Motion:

> (1) the validity of the plaintiff's assertion of his Fifth Amendment privilege, (2) the costs to the plaintiff associated with compelling him to answer the deposition questions at issue, (3) the extent to which upholding his assertion would thwart discovery of issues at the heart of plaintiff's lawsuit, and (4) whether and how easily the defendants could obtain the information sought from other sources.

<u>Swann</u>, 462 F.Supp.2d at 713; <u>Graham</u>, 2021 WL 2207403, at *4.

Counsel for Smith advised him to invoke his right on a question-by-question basis as opposed to issuing a blanket refusal to respond to any questions. As the twenty-nine refused questions relate to several categories and those categories require unique applications of the balancing test, the Court will weigh the factors as to each category independently.[4]

### 1.    Smith's Prior Criminal Conduct

The first category relates to Smith's 1997 conviction for manslaughter in the Circuit Court for Cecil County, Maryland. Police Defendants asked Smith two questions about his

---

[4] The Court notes that Police Defendants make global arguments regarding Smith's refusal to answer questions in their Motion. (Mot. at 6–15). Further, Police Defendants do not address Smith's response categorizing the questions into discrete topic areas in their Reply. (<u>See</u> Defs.' Reply Pl.'s Opp'n Mot. Compel Alternative Mot. Dismiss ["Reply"] at 2–8, ECF No. 83). Accordingly, the Court cannot consistently present Police Defendants' positions as they relate to the specific question categories set forth by Smith.

prior conviction. (See Smith Dep. at 185:13–14, 187:2–3). As for the first factor, Smith concedes, as he must, that further prosecution relating to his conduct underlying the 1997 state conviction is unlikely. (Opp'n at 14). Nonetheless, Smith contends that the risk of prosecution still exists as he could be exposed to federal conspiracy charges. (Id.). In order for an invocation to be valid, the risk of prosecution need only be "plausible," not likely. Custer Battles, 415 F.Supp.2d at 633. Further, the privilege applies "not only to evidence which may directly support a criminal conviction, but to 'information which would furnish a link in the chain of evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution.'" Sharp, 920 F.2d at 1170 (emphasis added) (quoting Maness v. Meyers, 419 U.S. 448, 461 (1975)). Here, Smith's invocation is valid, if only narrowly so. Indeed, the risk of federal prosecution regarding his nearly twenty-five-year-old conduct appears remote. Nonetheless, it is plausible that questioning about his prior manslaughter conviction, a serious crime, could touch on information that would furnish a link in the chain of evidence that could lead to federal charges. Manslaughter is a crime under federal law, and Smith has only been convicted of the offense on the state level. See 18 U.S.C. § 1112. Second, the cost to Smith associated with compelling him to answer questions regarding his manslaughter conviction is high—he could be subject to federal criminal liability and imprisonment.

Third, and most convincing here, upholding Smith's assertion of privilege would not "thwart[] discovery of issues at the heart of [Smith's] lawsuit." See Wehling, 608 F.2d at 1086. Smith's lawsuit relates to Police Defendants' alleged excessive use of force in

February 2017. Accordingly, the central issue in this case is whether the actions of Police Defendants during the traffic stop were reasonable under the circumstances. Smith's 1997 conviction for manslaughter and the facts relating to that conviction are not probative of any issue at the heart of this lawsuit. At most, it may relate to Smith's credibility as a witness, which is "less central" to the issue in this case. See Swann, 462 F.Supp.2d at 714 (finding that questions relating to plaintiff's credibility but not to the central issue of alleged excessive force would not thwart critical discovery). Moreover, as Smith notes in his Opposition, he acknowledged the existence of his prior convictions during his deposition. (Opp'n at 16). Thus, to the extent Police Defendants are interested in the line of questioning to present evidence regarding Smith's credibility, they already have Smith's acknowledgement of the conviction.  Fourth, Police Defendants can obtain this basic information from other sources, namely, the criminal records and trial evidence associated with Smith's 1997 conviction. As such, Smith is not the only source of information regarding the factual circumstances underlying the offense.

Overall, although the risk of federal prosecution is relatively low, the less-than-central nature of this line of questioning and the readily available alternative sources of the requested information weighs against compelling Smith to answer questions regarding his 1997 manslaughter conviction over his invocation of privilege. The Court will deny Police Defendants' Motion as to this category of questions.

**2.      Category Two: Smith's Prior, Potentially Illegal Sources of Income**

During the deposition, Police Defendants asked a question about Smith's sources of income before the incident: "I guess from October 2016 up until the date of the incident

how were you supporting yourself?" (Smith Dep. at 170:19–21). Smith asserts that he has been charged with drug-trafficking offenses on multiple occasions and questioning about his income from unlawful employment could expose him to federal and state criminal liability. (Opp'n at 17). At bottom, the Court agrees.

First, Smith's invocation of the privilege is valid. To the extent Smith earned money by trafficking drugs, responding to the question regarding that income source "from October 2016 up until the date of the incident" would be against his interests. (Smith Dep. at 170:19–21). Second, the cost to Smith associated with compelling him to respond to the question is high. Smith has not been granted immunity for his testimony and compelling Smith to respond to the question could expose him to further criminal liability related to drug trafficking.

As for the third factor, Smith's refusal to respond to the question does not thwart discovery of issues at the heart of his lawsuit. It is true that Smith's claims for damages include a claim for future lost wages. (Opp'n at 17). Smith asserts, however, that his claim extends only to legal sources of income—specifically, his potential future income in the fields of sanitation and factory work. (Id.). Moreover, Smith willingly testified about those legal sources of income during the deposition and he is not making any claims for lost income related to illegal drug trafficking. As such, his refusal to expound on his potentially illegal sources of income between 2016 and 2017 does not thwart discovery of issues central to his excessive force claims. Finally, Police Defendants could and were able to obtain information relevant to Smith's claims for lost wages because he responded to many other questions tied to his prior, lawful sources of income. (Smith Dep. at 156:19–170:18).

Accordingly, the <u>Swann</u> factors weigh against compelling Smith to testify about any illegal sources of income from this time period. The Court will deny Police Defendants' Motion as to this category.

### 3.    Category Three: Smith's Prior Presence in the Area

Next, Police Defendants asked Smith five questions about his prior presence in North East, Maryland and, specifically, the North East Shopping Plaza. (Smith Dep. at 45:3–5, 45:14–16, 46:4–5, 46:21–47:1, 58:21–22). Police Defendants characterize the line of questioning as "basic geographical familiarity questions" which "were stonewalled" by Smith. (Mot. at 5). Smith, on the other hand, responds that the questions were irrelevant and contends that Police Defendants are attempting to connect him to the uncharged theft of a handgun from the Plaza. (Opp'n at 18–19). Smith avers that MSP has previously "tried to question" him about the handgun, that counsel for Police Defendants were aware of the earlier investigation, and that the line of questioning appeared "intended to potentially incriminate" him in the theft. (Opp'n at 19). At bottom, the Court declines to order Smith to answer the questions.

First, Smith has a valid Fifth Amendment privilege. Smith has not been charged with the theft and therefore being forced to answer questions that could implicate him in that offense would cause him to testify against his interests. The MSP have investigated Smith for the offense before—in fact, it was that same investigation that led to the 2016 Arrest. Accordingly, his testimony about his prior presence in the area could furnish a link in the chain of evidence that could lead to future prosecution in the uncharged theft of the handgun or in a new federal charge of felon in possession of a firearm. See <u>Sharp</u>, 920 F.2d

at 1170; see also 18 U.S.C. § 922(g). Further, the cost is apparent and high. Smith avers that if he is connected to the theft, he could be charged with multiple criminal offenses in both state and federal courts. (Opp'n at 19).

Third, this information bears little relevance to the issues at the heart of Smith's lawsuit. As explained, the core issue in this suit is whether Police Defendants used excessive force against Smith. His familiarity with North East, Maryland or the North East Shopping Plaza is of little import. As such, declining to compel Smith to testify will not thwart discovery.

Fourth, Police Defendants have other sources of information regarding Smith's presence in the area, including police investigative files and trial evidence from Smith's prior convictions.[5] See Smith, No. C-07-CR-17-945. On balance, the low significance of the line of questioning to the central issues of the lawsuit coupled with the relative risk it poses to Smith weighs against compelling Smith to testify. Moreover, the Court finds Smith's argument that Police Defendants may be using this line of questioning to obtain incriminating information in an entirely separate case concerning. While the Court does not assume any ill-intent, it declines to order Smith to testify over his invocation as to matters that could expose him to liability in what appears to be an open case.

---

[5] Smith also asserts that Police Defendants tracked his whereabouts on the day of the arrest and have data obtained from a warrant for pen register location information. (Opp'n at 21). He also contends that the police secured information from a confidential informant relevant to Police Defendants' inquiry. (Id.). Although that information is not included in the record before this Court, if Smith is correct, the police have abundant information about his presence in the area.

As such, the Court will decline to order Smith to respond to this category of questions.

### 4. Category Four: Prior Travel

Police Defendants asked Smith seven questions about his travel earlier in the day on February 16, 2017. (See Smith Dep. at 37:13–14, 38:9–10, 38:22–39:1, 40:18–19, 41:14–15, 43:10–11, 43:22–44:1). Smith characterizes this travel as "possibl[y] interstate" and argues that such questions could expose him to federal racketeering or drug distribution charges. (Opp'n at 22). The Court will not order him to respond to the questions.

First, Smith has a valid Fifth Amendment privilege as to these questions. Smith asserts that responding to the questions about his whereabouts earlier in the day, before the incident took place, could expose him to criminal liability. Specifically, Smith contends that at the time, he lived in Pennsylvania and was arrested in Maryland. (Opp'n at 22). He argues that because certain federal crimes relate to interstate travel, and because of his history of drug-trafficking offenses, his answers to these questions could be potentially incriminating. (Id. (citing 18 U.S.C. § 1952 (racketeering))). Further, even if the risk of prosecution is unlikely, it need be only plausible for the privilege to be valid. And the consequence of such an admission could be steep, as Smith could be exposed to federal criminal liability for drug-trafficking offenses that cross state lines.[6]

---

[6] Smith also argues that he has a valid privilege because he has pending post-conviction challenges to his state convictions. As the Court has determined that his risk of federal liability is plausible, it need not make a determination as to the validity of his invocations as they relate to his post-conviction challenges.

As for the third factor, Smith's travel earlier in the day is not central to his claims for excessive use of force. As Smith notes in his Opposition, Police Defendants have not argued that Smith's earlier travel—that is, before his initial traffic stop—was relevant to their use of force determinations. (Opp'n at 24). Finally, Police Defendants could obtain information regarding his travel from other sources. Smith avers that there is "abundant evidence" in his state criminal trials relating to his whereabouts on the day of the incident. (Opp'n at 24 (citing <u>Smith</u>, Case No. 07-CR-17-945)).

Accordingly, the Court declines to compel Smith to respond to this category of questions.

### 5. Category Five: The Initial Traffic Stop and Alleged Assault of Cox

Next, Police Defendants asked Smith thirteen questions about his initial traffic stop on February 16, 2017 and his interactions with Cox before Smith fled in his vehicle. (Smith Dep. at 44:12–13, 48:11–14, 49:13–15, 50:2–4, 50:16–17, 51:5–7, 51:18–19, 52:9–11, 52:22–53:2, 53:10–12, 54:21–55:3, 56:20–57:1; (<u>e.g.</u>, "did there come a time when an officer approached your vehicle on Route 272?"). Smith contends that he "wrestled most" with his invocation as it related to this category of questions, but he ultimately believes that he should not be compelled to respond. On this point, the Court disagrees and will order Smith to respond to the questions.

First, the validity of Smith's invocation is less certain. Here, the questions were not open-ended queries about what Smith was doing earlier in the day, whether he had previously been to the site of an unrelated crime, or whether he had potentially illegal sources of income. Rather, the questions are much more tailored to the factual

circumstances that led to the alleged improper use of force. In other words, the questions here do not inherently carry the same subtextual risk of self-incrimination as those asked in the previous categories. Accordingly, ordering Smith to respond to these questions presents a lower risk than the earlier categories that Smith would be forced to testify against his interests. As for the second factor, Smith concedes that the cost is also in question because Smith has already been tried and convicted of assaulting Cox when he left in his vehicle. (Opp'n at 26). "It is established law that because a witness has been found guilty of the actions in question he is no longer entitled to claim the privilege of the fifth amendment with respect to those matters and he may be compelled to testify about them." United States v. Heldt, 668 F.2d 1238, 1253 (D.C. Cir. 1981) (citing cases). As such, Smith's invocation may not be valid.

Third, these questions are significantly more relevant to the issues at the heart of Smith's lawsuit. Indeed, Smith is arguing here that the Police Defendants used excessive force in his arrest. Smith's conduct during the first traffic stop likely has some bearing on Police Defendants' decision-making as they attempted to apprehend Smith—specifically, Smith's behavior during the first traffic stop may have factored into Police Defendants' assessment of the necessity of any use of force. Smith argues that "[t]he initial traffic stop and Mr. Smith's subsequent surrender after the police chase are distinct events, separated by time, distance, and the involvement of additional officers." (Opp'n at 26). While this is certainly true, the events are not separated by much. Although the transcript was not provided to the Court, Smith cites Cox's deposition for the premise that the chase stretched about "three or four miles" before Smith stopped on I-95. (Opp'n at 5 (citing Dep. Michael

21

Cox at 44:24–45:6)). This is not a significant period of time. Further, it is entirely conceivable that the first stop, and particularly Smith's alleged assault on Cox and decision to drive away, was related to Police Defendants' assessment of the reasonableness of any use of force during the second stop. Moreover, Smith's recollection of the events at the first stop may differ from that of the Police Defendants, requiring the trier of fact to make credibility determinations relevant to the ultimate use of force. And for this reason the fourth factor, alternate sources of the requested information, also weighs in favor of compelling Smith's testimony here.

Accordingly, the Court will grant Police Defendants' Motion as it relates to the Category Five questions. The Court notes, however, that its decision is limited only to the questions specifically asked during Smith's deposition and identified in the Court's Memorandum Opinion.

### 6.     Category Six: Events after Smith's Arrest

The final category relates to Police Defendants' sole question about Smith's conversations with Cox: "When you saw Officer Cox I guess the first time after the incident . . . at [Howard R. Young Correctional Institution], do you recall any conversations you had with . . . Officer Cox at that time?" (Id. at 132:10–13). Smith avers that "Cox was at the prison to collect Mr. Smith's DNA for purposes of connecting him to a bag of narcotics allegedly discovered on the side of the highway." (Opp'n at 29). As the question bears little relevance, the Court will decline to order Smith to answer.

First, it is somewhat difficult for the Court to determine whether Smith had a valid Fifth Amendment privilege. According to his own characterization, the conversation

related to the taking of Smith's DNA. (Opp'n at 29). On a surface level, it is unclear whether Smith's testimony about that conversation would pose a risk of self-incrimination. It is possible that the scope of the conversation was limited to an explanation that Cox was there to take a DNA sample, which does not appear from its face to be potentially incriminating. Nonetheless, it is also possible that Cox and Smith went into more lengthy discussions about Smith's drug-trafficking activities, which would carry with it a more real risk of self-incrimination. If the conversation necessarily touched on potentially incriminating topics, the stakes would be high, as Smith could be exposed to criminal liability.

As to the third factor, it appears unlikely that Smith and Cox's conversation goes to the heart of Smith's excessive force lawsuit. The conversation occurred when Smith was in custody and after the use of force; as a result, its relevance to those central matters appears limited. Further, as Smith points out, there are alternative sources for this information—namely, Cox's own testimony regarding the discussion. Therefore, the necessity of Smith's testimony on this point is similarly low.

Balancing the factors, even though the validity of the invocation is less clear, the limited relevance and readily available alternative sources of obtaining this information augur in favor of denying Defendants' Motion as to this question.

## C.    <u>Sanctions</u>

Police Defendants request that the Court dismiss Smith's lawsuit whether the Court compels the questions or not, arguing that in either case they are being forced to "defend themselves with a severe handicap." (Mot. at 15). Police Defendants stretch the premise

even further, asserting that "[p]ermitting plaintiffs to adopt this tactic deprives defendants in every case of their most fundamental rights." (Id.). The Court disagrees that the drastic sanction of dismissal is appropriate here.

As explained, the court "may not impose a sanction on a litigant that would make an assertion of his Fifth Amendment privilege 'costly.'" Swann, 462 F.Supp.2d at 712 (quoting Griffin, 380 U.S. at 614); see also Graham, 2021 WL 2207403, at *6–7. Specifically, "[t]he type of 'cost' condemned by the Supreme Court includes (1) forcing of a party to choose between the Fifth Amendment privilege or dropping her lawsuit, or (2) requiring the party to continuing with her lawsuit and exposing herself to criminal liability." Deakins v. Pack, 957 F.Supp.2d 703, 766–67 (S.D.W.Va. 2013). Dismissal is an "extreme sanction" that is only appropriate "where other, less burdensome, remedies would be ineffective means of preventing unfairness to defendant." Graham, 2021 WL 2207403, at *7 (first quoting Varner v. Roane, No. 5:17-cv-00080, 2018 WL 3244108, at *4 (W.D.Va. July 3, 2018); and then quoting Serafino, 82 F.3d at 518 n.5).

Here, dismissal is not warranted. First, the Court notes that Smith did not categorically refuse to answer any questions during his deposition under the guise of the Fifth Amendment. Indeed, Smith estimates that he answered about 730 questions during his four-and-a-half-hour deposition, only declining to answer twenty-nine after careful consideration of his right against self-incrimination. (Opp'n at 1). Further, Smith has thus far complied with the Court's Orders. (See May 21, 2021 Letter Order at 4, ECF No. 72 (admonishing counsel for Smith to "carefully consider each question posed to [Smith] and make a good faith recommendation to [Smith] as to whether or not to invoke his

constitutional right against self-incrimination, in lieu of a blanket invocation")). Finally, there are far less extreme remedies available, as the Court can and will require Smith to respond to the questions this Court has deemed appropriate.

Accordingly, the Court will deny Police Defendants' requested sanction of dismissal. The Court will direct Smith to order the questions identified in category five. Should Smith to refuse to comply with the Court's Order, he may expose himself to future sanctions. See Graham, 2021 WL 2207403, at *7.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Police Defendants' Motion to Compel, or in the Alternative, Motion to Dismiss. (ECF No. 78). A separate Order follows.

Entered this 15th day of March, 2022.

_____/s/_____
George L. Russell, III
United States District Judge
